IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

MARIA B. GAUTIER-FIGUEROA

    Plaintiff,

              v.

BRISTOL-MYERS SQUIBB PUERTO RICO, INC., et al.

    Defendants.

**Civil No. 11-1155 (SEC)**

**OPINION AND ORDER**

Before the Court is plaintiff Maria Gautier-Figueroa's ("Gautier") motion to remand to state court (Docket # 72). Because the Employee Retirement Income Security Act of 1974 ("ERISA"), 88 Stat. 829, as amended, 29 U.S.C. § 1001 et seq. is inapplicable, and there being no other federal question here, Puerto Rico contractual law controls. Gautier's motion, therefore, is **GRANTED.** Consequently, to the extent that the Opinion and Order of June 20, 2011 in Gautier-Figueroa v. Bristol-Myers Squibb Puerto Rico, Inc., 792 F.Supp.2d 240 (D.P.R. 2011) is inconsistent with the conclusions set forth below, it is hereby **SET ASIDE**.

**Factual and Procedural Background**

What should have been a typical employee-against-employer state suit for breach of contract has, unfortunately, taken an unpredictable turn into an arcane area of the ERISA legislation. This case arises following Gautier's filing of a complaint in state court against her former employer, Bristol-Myers Squibb Puerto Rico, Inc. ("Bristol" or the "Company"), alleging, among other related state-law claims, that Bristol had breached the "BMS Puerto Rico Severance Pay and Release Agreement" (the "Severance Agreement") by virtue of which she waived all her claims against Bristol arising from her involuntary termination. Docket # 8-1, pp.

7-8.[1] A comprehensive recount of Gautier's factual and underlying allegations provides the context and background necessary to set the stage for the analysis.

The 41 year-old Gautier began working for Bristol in 1998, and eventually reached the position of Director Parenteral O.S.D. & Packaging at Bristol's manufacturing plant in Manati, Puerto Rico. Docket # 59, ¶¶ 8-10. While she worked there, Gautier did well: her total salary with benefits totaled $150,566 per year. Id., ¶ 11.

But that all changed on May 5, 2010, when Bristol terminated her for no particular reason. Id., ¶ 11. At Gautier's termination meeting, Rosa Sanabria-Nazario, Bristol's Human Resources Director, provided her with a notice of termination (the "Notice of Termination"), a termination package comprised of several attachments, including the Severance Agreement she had to sign and deliver by May 19, 2010, the effective date of her termination. Id., ¶ 13.[2] The Company drafted and prepared such documents in their entirety, and according to the complaint, Sanabria told Gautier that in order to receive her severance benefits, she had to sign these documents, which were presented in terms of "take it or leave it." Id., ¶ 15. In pertinent part, the Notice of Termination provided:

> Your severance pay calculation appears on this attachment. Severance pay will be provided to you in accordance with the terms and provisions of the Bristol-Myers Squibb Company Puerto Rico, Inc. Severance Plan and Summary Plan Description (the Severance Plan). If you comply with the requirements described below, severance benefits will be paid to you at regular payroll intervals until the full benefit is paid. If you

---

[1] That action, filed in the Puerto Rico Court of First Instance, San Juan Superior Court was styled Maria B. Gautier Figueroa v. Bristol Myers Squibb Puerto Rico, Inc., et al., KAC2010-1552 (803).

[2] The Notice of Termination included the following attachments: (1) a Severance Pay Worksheet; (2) the General Release; (3) a Certification of Employment Form; (4) a Summary of Benefit Coverages, a one-page document that explained her health benefits and COBRA; and (5) Vacation Pay Summary. Docket # 6-1, pp. 1-4.

obtain new employment, however, the balance of any outstanding severance payments that may be due will be paid to you in a lump sum.

Docket # 6-1, p. 1.

Paramount to the Notice of Termination was a general release attachment (the "General Release") Gautier had to sign in the same prescribed period of time, or else she "[would] not be eligible for Basic Severance or Supplemental Severance." Id.[3] In fact, per the Notice of Termination, failure to sign the General Release would entail that she would receive no post-termination benefits. Id. The General Release listed a plethora of employment-related statutes that Gautier relinquished "[i]n consideration of the execution of and [Gautier's] compliance with the [General Release] . . . ." Id., p. 7-8. One of the laws Gautier "waived" was ERISA; in fact, this is the only instance where the acronym "ERISA" appears in the Notice of Termination and its attachments. Further, the General Release provided that it would "[b]e governed by the laws of the Commonwealth of Puerto Rico . . . ." Id., p. 9.

The severance worksheet attachment (the "Severance Worksheet") in turn provided for the simple tabulation of basic and supplemental severance, see id., p. 5, both of which were calculated by a mathematical formula. For instance, "[b]asic pay [was [Gautier's] weekly base rate of pay at [her] termination date, including salary reductions . . ., and excluding any overtime pay, any individual sales bonuses or other additional incentive payments." Id. Gautier's Supplemental Severance, meanwhile, was calculated based on three months of salary plus two weeks pay for each full year of service. In short, her severance pay yielded $189,838 in supplemental severance and $4,632 as basic severance, for a total of $194,271. Per the Severance Pay Worksheet, Bristol's obligation to make severance payments ran from May 19, 2010 to November 9, 2010. Id.

[3] The General Release gave Gautier twenty one days as opposed to the fourteen days alleged in the complaint. Docket # 6-1, p. 7.

Both parties signed the Severance Agreement in early May 2010 and thereafter Bristol started making the corresponding severance payments. But on July 14, 2010, the Company, through Beatriz B. Sanabria, sent a letter to Gautier where it "temporarily" suspended her severance payments, citing a "system error" that miscalculated her supplemental severance. Docket # 6-1, p. 11.[4] The Company stated that the "correct" amount was $68,102: over a sixty percent reduction from the original $194,271 it had agreed to. Id. Bristol also provided Gautier with a new "severance package," (the "New Agreement"), which incorporated the referenced reduction. This time, however, Bristol gave Gautier forty five days to consider the New Agreement. And, as was the case with the Severance Agreement, failure to sign and timely return the New Agreement would entail that Bristol would no longer "[m]ake any further severance payments." Id.

According to the complaint, in late August 2010, the Company froze its severance payments, having paid then $88,936 of the $194,271 it had bound itself to pay. Docket # 59, ¶¶ 62-64. Then, on August 23, 2010 Gautier, through counsel, sent a letter to Sanabria rejecting the New Agreement and demanding compliance with the Severance Agreement contract signed in May 2010. Docket # 6-1, p. 25.[5]

---

[4] Apparently, Rosa Sanabria-Nazario and Beatriz B. Sanabria, although with purportedly different names, appear to be one and the same: the Director of Human Resources. See Docket # 6-1 pp. 4 & 11.

[5] In pertinent part, such letter stated as follows:

[Gautier] is hereby rejecting the . . . "new offer" . . . .[She] does not accept [Bristol's] proposal to cancel or change the contract that both parties already [had] agreed to and signed [in] May 2010. It is [Gautier's] position that there is a valid and binding contract agreed upon and signed by both parties. . . . The [Severance Agreement] . . . as well as its attachments are documents prepared, in its entirety, by [Bristol]. The company had more than enough opportunity to prepare, discuss, calculate . . . , and verify the information and amounts included in said documents,

A new player emerged on September 7, 2010, when the heretofore nonexistent Plan Administrator of the Bristol-Myers Squibb Puerto Rico, Inc. Severance Plan (the "Severance Plan"), through counsel, replied to Gautier's letter rejecting the New Agreement. Docket # 24-1, p. 1. Enter ERISA: the Plan Administrator stated that Gautier's letter "[h]a[d] been deemed by [it] as a first-level appeal under the [Severance] Plan, and [would] be handled as such." Id. Noting that Gautier's claims were controlled by ERISA, the Administrator gave Gautier until November 24, 2010 to submit additional comments, arguments or evidence sustaining her position. Id.

An exchange of correspondence ensued between the Administrator and Gautier's counsel. Gautier reiterated that her claims were directed at Bristol for the alleged contractual breach of the Severance Agreement, clarifying in turn that such cause of action had no relation to ERISA, Docket # 24-2, while the Plan Administrator insisted that ERISA controlled the parties' dispute. Docket # 24-3. Things unraveled and Gautier filed suit in state court on December 30, 2010, seeking damages for Bristol's alleged noncompliance with the payments set forth in the Severance Agreement, i.e., the amount agreed to in May 2010. See generally Docket # 1-1.

Then, on February 11, 2011, Bristol filed a timely Notice of Removal (Docket # 1) before this court, arguing that because Gautier sought to recover benefits pursuant to an ERISA plan, removal was proper. A month later, Gautier filed a motion to remand to state court (Docket # 12), maintaining that (1) the complaint on its face made no reference to ERISA, id., ¶¶ 22-35; and (2) her Severance Agreement did not constitute an ERISA plan, id., at ¶¶ 46-67. On June

---

prior to making the offering and . . . signing of said contract. Therefore, if there was any discrepancy, it was due only to [Bristol's] actions or omissions.

Id.

20, 2011, the Court entertained these issues, framing the controversy as follows: (1) is the Severance Agreement between Bristol and Gautier part of an employee benefit plan?; (2) if so, does the "complete preemption" doctrine apply? Gautier-Figueroa, 792 F.Supp.2d at 242.

In answering the first question in the affirmative, this court stated: "the [Severance] Plan is the kind of ongoing, centrally administered, bureaucratic behemoth whose beneficiaries Congress intended to innoculate from multifarious state legislation pursuant to its Commerce Clause powers." Id. at 244 (citations omitted). Because Gautier sought to recover benefits due to her under the Severance Plan, the Court reasoned, her cause of action "[f]ell directly under § 502(a)(1)(B) of ERISA." Id. (citation omitted). Ultimately, this court held that complete preemption applied, and consequently, removal had been proper. Id. (citations omitted).

Following an active motion practice, the Court entered an Order on November 4, 2011, asking Bristol to show cause as to why it should not reconsider its June 20, 2011 Opinion and Order.[6] In pertinent part, the Order stated:

> Absent from that opinion . . . were important factors that could change the outcome of this case, potentially depriving this Court's jurisdiction. For example, whether a "one-person" contract such as the one present here, constitutes an ERISA plan; the issue of whether the Gautier's severance "plan" created and imposed upon Bristol an administrative burden substantial enough to invoke ERISA status was likewise sidelined. (citing, *inter alia*, D'Oliviera v. Rare Hospitality Intern., Inc., 150 F.Supp.2d 346, 353 (D.R.I. 2001). . . .
>
> * * *
>
> Furthermore, "[f]rom a reasonable employee's point-of-view, the plan might not appear to be an 'expressed intention by the employers to provide benefits on a regular and long term basis,' but a temporary program 'solely for the purpose of employee attrition.'" De Jesus v. Wyeth Pharmaceuticals Co., No. 09-1353, 2009 WL 3048415, at *6 (D.P.R. Sept.

---

[6] The Company moved to amend the Case Management Order, arguing that "[d]iscovery, pretrial and trial proceedings are inapposite to the adjudication of this case." Docket # 25, p. 1. Further, the Company moved to dismiss, alleging among other grounds, that Gautier failed to exhaust the requisite administrative remedies prior to filing suit. Docket # 71, p. 18.

---

> 16, 2009) (citations omitted). The issue of whether the severance plan's "benefit obligations are merely a one-shot, take-it-or-leave-it incentive . . . ," id. at *5, was likewise ignored. See also Young v. Wash. Gas Light Co., 206 F.3d 1200, 1203-04 (D.C.Cir. 2000) (holding that ERISA did not apply to a severance plan when "the determinations of eligibility and the amount of the benefits to be paid were purely mechanical").

Docket # 51, p. 2.

Bristol timely complied with the Court's Show Cause Order. Docket # 56-1. Gautier responded and the Company replied. In a nutshell, Gautier contends the Severance Plan in this case does not constitute an ERISA plan because it required no "ongoing administrative scheme." Docket # 62, p. 8. The Company, on the other hand, contends that the severance benefits exist solely because of the Severance Plan, which in turn requires an administrative apparatus.

**Standard of Review**

Because federal courts are the sole guardians of their limited jurisdiction, they have an obligation to examine their subject-matter jurisdiction *sua sponte* at all stages of the litigation. E.g., American Policyholders Ins. Co. v. Nyacol Products, Inc., 989 F.2d 1256, 1258 (1st Cir. 1993) ("A federal court is under an unflagging duty to ensure that it has jurisdiction over the subject matter of the cases it proposes to adjudicate."). Even if the parties "have disclaimed or have not presented" issues that go to a court's subject-matter jurisdiction, courts are nevertheless obligated to consider them on their own accord. Gonzalez v. Thaler, 565 U.S. ——, ——, 132 S.Ct. 641, 648 (2012) (citing United States v. Cotton, 535 U.S. 625, 630, 122 S.Ct. 1781, 152 L.Ed.2d 860 (2002)).  As a corollary of this jurisdictional duty, federal courts must, on their own initiative, "[i]nquire into [their] jurisdiction in removed cases and remand the same to the local courts for lack of it." Gonzalez-Roman v. Federal Land Bank of Baltimore, 303 F.Supp. 482, 483 (D.P.R. 1969) (citations omitted).

Against this backdrop, it is common ground that a suit filed in state court, founded on a claim arising under federal law, may be removed to the District Court, irrespective of the parties' residence. 28 U.S.C. § 1441(b). But a cause of action arises under federal law only "[w]hen the plaintiff's statement of his own cause of action shows that it is based upon [federal law] or [the] Constitution." Louisville & Nashville R.R. Co. v. Mottley, 211 U.S. 149, 152, 29 S.Ct. 42, 43, 53 L.Ed. 126 (1908). Under this well-pleaded complaint rule, the fact that a defense to the plaintiff's cause of action may involve federal law is insufficient grounds for removal. Id. However, "a plaintiff may not defeat removal by omitting to plead necessary federal questions." Franchise Tax Bd. v. Construction Laborers Vacation Trust, 463 U.S. 1, 22, 103 S.Ct. 2841, 2853, 77 L.Ed.2d 420 (1983) (citations omitted).

Nevertheless, if a court finds that "a plaintiff has 'artfully pleaded' claims in this fashion, it may uphold removal even though no federal question appears on the face of the plaintiff's complaint." Rivet v. Regions Bank of Louisiana, 522 U.S. 470, 475, 118 S.Ct. 921, 925, 139 L.Ed.2d 912 (1998).Once a suit has been removed, the law provides for remand "if 'the case was removed improvidently and without jurisdiction.'" Ochoa Realty Corp. v. Faria, 815 F.2d 812, 815 (1st Cir. 1987) (citation omitted); 28 U.S.C. § 1447(c) ("If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded [to the Commonwealth court.]").

### Applicable Law and Analysis

*Whether the Severance "Plan" falls under the purview of ERISA*

Congress enacted ERISA to guarantee "[t]hat employees would receive the benefits they had earned, but Congress *did not require employers to establish benefit plans in the first place*." Conkright v. Frommert, ––– U.S. ––––, 130 S.Ct. 1640, 1658, 176 L.Ed.2d 469 (2010) (citing Lockheed Corp. v. Spink, 517 U.S. 882, 887, 116 S.Ct. 1783, 135 L.Ed.2d 153 (1996)

(emphasis added)); <u>Firestone Tire and Rubber Co.</u> v. <u>Bruch</u>, 489 U.S. 101, 113, 109 S.Ct. 948, 956, 103 L.Ed.2d 80 (1989) ("ERISA was enacted to promote the interest of employees and their beneficiaries in employer benefit plans and to protect contractually defined benefits.") (citations and internal quotation marks omitted); <u>see also</u> H.R. Rep. No. 93-533 (1973), as reprinted in 1974 U.S.C.C.A.N. 4639, 4639 ("The primary purpose of [ERISA] is the protection of individual pension rights . . . ."). With ERISA, moreover, Congress sought to mitigate the administrative burden associated with an employee benefit plan, providing a "uniform set of administrative procedures governed by a single set of regulations." <u>Fort Halifax Packing Co.</u> v. <u>Coyne</u>, 482 U.S. 1, 11 107 S.Ct. 2211, L.Ed.2d 1 (1987). Such framework "safeguard[s] employee interests by reducing the threat of abuse or mismanagement of funds." <u>O'Connor</u> v. <u>Commonwealth Gas Co.</u>, 251 F.3d 262, 266 (1st Cir. 2001) (citing <u>Mass.</u> v. <u>Morash</u>, 490 U.S. 107, 115 (1989) (internal quotation marks omitted)).

Under ERISA, an employee benefit plan can constitute an employee welfare benefit plan, 29 U.S.C.A. § 1002(1), an employee pension benefit plan, 29 U.S.C.A. § 1002(2), or both, 29 U.S.C.A. § 1002(3).[7]   Pursuant to the Labor Department regulations, severance pay plans or severance arrangements—payments made by employers to employees who are involuntarily

---

[7] ERISA defines an "employee welfare benefit plan" as

> [a]ny plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services . . . .

29 U.S.C. § 1002(1).

terminated—*may* be treated as employee welfare benefit plans, rather than as pension plans. 29 U.S.C.A. § 1051

ERISA need not always govern a severance pay plan, however: merely labeling a benefit program as such does not automatically turn it into an ERISA plan, see e.g., O'Connor, 251 F.3d at 266, which is why courts have consistently reiterated that "[t]he ERISA statute is fairly broad and its terms are defined ambiguously, if at all, leaving the task of providing a clearer interpretation of the statutory provisions to the courts." D'Oliviera, 150 F.Supp.2d at 350 (citation omitted); Belanger v. Wyman-sGordan Co., 71 F.3d 451, 454 (1st Cir. 1995) ("The text of ERISA itself affords scant guidance as to what constitutes a covered 'plan.'").[8]

In determining whether the Severance Plan is a covered ERISA plan, "[t]he beacon by which [courts] must steer is Fort Halifax." Id. There, the Supreme Court recognized ERISA's statutory vacuum. 482 U.S. at 8, 107 S.Ct. at 2216, L.Ed.2d 1. And, giving meaning to ERISA's enigmatic language, the Court reasoned that because ERISA centers on the administrative integrity of benefit plans, only those plans requiring ongoing administrative activity fall under the gamut of ERISA insofar they are subjected to employer abuse. See id. at 16. In deciding that a Maine statute requiring the payment of a severance benefit by an employer who relocated did not amount to a "plan" for ERISA purposes, the Fort Halifax Court held:

> The requirement of a one-time, lump-sum payment triggered by a single event requires no administrative scheme whatsoever to meet the employer's obligation. The employer assumes no responsibility to pay benefits on a regular basis, and thus faces no periodic demands on its assets that create a need for financial coordination and control. Rather, the employer's obligation is predicated on the occurrence of a single contingency that may never materialize. . . . To do little more than write a

---

[8] Hence, "[a]ttention to purpose is particularly necessary in this case because the terms 'employee benefit plan' and 'plan' are defined only tautologically in the statute, each being described as 'an employee welfare benefit plan or employee pension benefit plan or a plan which is both an employee welfare benefit plan and an employee pension benefit plan.'" Fort Halifax, 482 U.S. at 8, 107 S.Ct. at 2216 (citation omitted).

> check hardly constitutes the operation of a benefit plan. Once this single event is over, the employer has no further responsibility. The theoretical possibility of a one-time obligation in the future simply creates no need for an ongoing administrative program for processing claims and paying benefits.

Id. at 12, 107 S.Ct. at 2218.

In a series of post-Fort Halifax cases, the First Circuit has had the opportunity to shed more light on what determines whether a given program falls under ERISA. The first of these was Simas v. Quaker Fabric Corp., 6 F.3d 849, 852-54 (1st Cir. 1993), where the Court of Appeals held that a "tin parachute statute," which provided severance pay for employees who lost their jobs following corporate takeovers, was preempted by ERISA because

> [t]he Massachusetts employer *needed* some ongoing administrative mechanism for determining, as to each employee discharged within two years after the takeover, whether the employee was discharged within the several time frames fixed by the tin parachute statute and whether the employee was discharged for cause or is otherwise ineligible for unemployment compensation under Massachusetts law . . . *for at least two years after the takeover, and probably beyond that point as to disputed terminations, the employer would have to maintain records, apply the "for cause" criteria, and make payments or dispute the obligation.*

Id. (emphasis added). The Simas court, moreover, observed that to deem a severance regime a "plan" within the meaning of ERISA, courts must consider the extent and complexity of administrative obligations of the program in question. Id. at 853.

Two years after deciding Simas, the First Circuit resolved Belanger where it construed Fort Falifax as mandating that to be considered a "plan" for purposes of ERISA, the program must "[i]nvolve[] the undertaking of continuing administrative and financial obligations by the employer to the behoof of employees or their beneficiaries." 71 F.3d at 454. In Belanger, a group of employees who accepted an early-retirement severance incentive sued their former employer after learning the latter had instituted a more generous package. Id. at 453. Holding that such severance incentives, based on years of service, did not comprise an ERISA plan, the

court concluded that the employer "required no complicated administrative apparatus either to calculate or to distribute the promised benefit." Id. at 455. The fact that the company made a succession of offers over a period of four years—as opposed to a "lone offer"— did not change the result. Id.

Rodowicz v. Mass. Mut. Life Ins. Co., 192 F.3d 162, 167 (1st Cir.1999) came next. There, the First Circuit was confronted with another voluntary termination program, where the severance payments (which the employee could elect to receive as a lump-sum payment or through weekly payments) were also calculated by multiplying a number of weeks' salary by years of service. Id. The benefits were offered to most employees during a five-week window and were conditioned on the employer's ability to defer retirement for up to six months. Holding that the plan in Rodowicz fell outside of ERISA's purview, the court held:

> [The plan] did not constitute an ERISA "plan." True, the VTP authorized certain exclusions and deferrals, as well as appeals by disappointed employees, making it somewhat less mechanical and unthinking than the Maine statutory scheme in Fort Halifax and the one-time payment schemes in Belanger. Yet, as the district court found, the VTP did not call for the sort of ongoing, individualized determinations necessitated by the "tin parachute" statute addressed in Simas. . . .

Id. at 171-72 (citations omitted).

In O'Connor, the First Circuit's latest guidance on this area of law, a Personnel Reduction Program (PRP), a type early retirement incentive, was at issue. 251 F.3d at 265. The PRP, which was offered to all non-officer employees during a fifteen-week period, contained the following benefits for employees who opted to retire: a severance bonus, pension credit, payment of COBRA premiums, and reimbursement for educational assistance and outplacement services. Id. After reminding that "[a] given plan must be evaluated in light of Congress' purposes in enacting ERISA[,]" id. at 266 (citation omitted), it made pellucid that courts must examine

> the nature and extent of an employer's benefit obligations. Those obligations are the touchstone of the determination: if they require an ongoing administrative scheme that is subject to mismanagement, then they will more likely constitute an ERISA plan; but if the benefit obligations are merely a one-shot, take-it-or-leave-it incentive, they are less likely to be covered.

Id. at 267 (citations and internal quotation marks omitted). Ultimately, the First Circuit held that the PRP fell "on the non-ERISA side of the line . . . ." Id. at 268-69. Such conclusion stemmed principally from the court's determination that the severance provision, the "primary component of the PRP," neither required employer's discretion nor mandated a complicated administrative scheme subject to mismanagement. See id. at 267-68.

Before moving along, it is essential to keep in mind that because "Congress [only] pre-empted state laws relating to *plans*, rather than simply to *benefits*." Fort Halifax, 482 U.S. at 11-12, 107 S.Ct. 2211(emphasis in original), courts must differentiate between plans, under which benefits are distributed, and benefits because "[o]nly 'plans involve administrative activity potentially subject to employer abuse." Id. at 16. In other words, merely providing employees with benefits is not necessarily indicative of the existence of a plan under ERISA. Hence, the Court will comb the record to ascertain whether the Severance Plan truly falls under ERISA's purview.

*The Opinion and Order of June 20, 2011*

As previously indicated, in its Opinion and Order of June 20, 2011, this court concluded that the Severance Plan fell under ERISA. In so doing, it held, without digressing, that the Severance Plan required an ongoing administration of a plan because the benefits were provided as part of a preexisting and ongoing severance plan. Gautier-Figueroa, 792 F.Supp.2d. at 244-45. But the Court only dedicated a one-paragraph discussion to such analysis, correctly distinguishing *one* aspect of the packages implicated in Fort Halifax, Rodowicz, and O'Connor:

namely, that they were all "[p]ayments available to a large number of company employees for a limited time period." Id. (citations omitted). Put another way, this court circumscribed its analysis to a sole factor: the preexistence of the Severance Plan.

This court, however, did not have the opportunity to determine whether the severance benefits, based on all pertinent facts, *justified* and *required* the establishment of an ongoing plan. After all, the "[i]nquiry into whether an employee welfare benefit plan may be classified as an ERISA plan requires a fact-intensive application of several factors . . . ." D'Oliviera, 150 F.Supp.2d at 351 (citing, *inter alia*, Belanger, 71 F.3d at 455); Demars v. CIGNA, Corp., 173 F.3d 443, 446 (1st Cir. 1999) (noting that no single act of the employer is indicative of an ERISA-regulated plan). The Court will thus proceed to "[e]valuate a purported plan like the [Severance Plan] as a unified whole." O'Connor, 251 F.3d at 267.

The Court begins its analysis with an affidavit included in Bristol's show cause response, stating the Severance Plan has been in place since 2009 and "[h]as been used to provide severance benefits in connection with terminations of multiple employees at all of Bristol's affiliates *in Puerto Rico* since its inception." Docket # 56-2, p. 1. (emphasis added). At the outset, because the Severance Plan is engineered to apply only in Puerto Rico, it stands incapable "[o]f applying uniformly in all jurisdictions where the employer might operate." Simas, 6 F.3d at 852 (quoting Ingersoll–Rand Co. v. McClendon, 498 U.S. 133, 142, 111 S.Ct. 478, 484, 112 L.Ed.2d 474 (1990)). As noted before, Congress enacted the ERISA to "ensure that plans and plan sponsors would be subject to a uniform body of benefits law . . . [so as to] minimize the administrative and financial burden of complying with conflicting directives among States or between States and the Federal Government." Ingersoll-Rand Co., 498 U.S. at 142, 111 S.Ct. at 78; Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 105 n. 25, 103 S.Ct. 2890, 2904 n. 25, 77 L.Ed.2d 490 (1983) ("Obligating the employer to satisfy the varied and perhaps

conflicting requirements of particular state fair employment laws . . . would make administration of a nationwide plan more difficult."). But no such peril exists here; the Severance Plan is narrowly tailored to apply exclusively to Puerto Rico.

Given such a confined and uncomplicated administrative scheme, ERISA's broad preemption provision appears unwarranted here. See Simas, 6 F.3d at 852; Fort Halifax, 482 U.S. at 10 ("'ERISA's comprehensive pre-emption of state law was meant to minimize this sort of interference with the administration of employee benefit plans,'" . . . so that employers would not have to '"administer their plans differently in each State in which they have employees.'" (quoting Shaw, 463 U.S. at 105, 103 S.Ct. at 2904 (footnote omitted))). Because no such "national" or uniform plan exists here, the Court feels compelled to reconsider its description of the Severance Plan as a "[c]entrally administered, bureaucratic behemoth whose beneficiaries Congress intended to innoculate from multifarious state legislation pursuant to its Commerce Clause powers." Gautier-Figueroa, 792 F.Supp.2d at 242.

*Au contraire*, in delimitating the Severance Plan to Puerto Rico, the Company not only ran afoul of the above-referenced guiding principle behind Congress's enactment of ERISA, but more crucially, and as elucidated below, it bore upon itself no "[t]ask of coordinating complex administrative activities." Fort Halifax, 482 U.S. at 11, S.Ct. 2211 at 2217. Having made this initial observation against finding an ERISA "plan," the Court will nevertheless dissect the Severance Plan to ascertain whether it can still pass muster.

*Severance Bonus*

Since the severance payments the Company unilaterally reduced here are both the Severance Plan's essence as well as Gautier's patent motivation for subscribing the Severance Agreement, the Court' perusal of the purported plan begins here. As previously mentioned, on May 5, 2010, Gautier released Bristol from any liability by means of the General Release; in

consideration for her waiver, Bristol committed to pay her a total of $194,271 in severance, among other marginal benefits the Court will examine later.   Docket # 6-1, p. 5. The supplemental severance, the gist Gautier's severance benefits, was calculated by a mechanical, simple mathematical formula, based upon Gautier's three months of salary plus two weeks pay for each full year of service. See Docket # 15-4, p. 5. Bristol's responsibility for making severance payments to Gautier was both short and formalistic: her severance pay would run from *May 19, 2010 to November 9, 2010*; Bristol would simply temporarily continue making its *regular electronic payroll deposits* (see Docket # 6-1, p. 5)—albeit for much less than before—to Gautier's bank account.

For starters, the Company does not even argue that such payments were made "[o]ut of an segregated trust fund established for that purpose . . . ." Rosario-Cordero v. Crowley Towing & Transp. Co., 46 F.3d 120, 124 (1st Cir. 1995).[9] Rather, Gautier's payments presumably originated from the Company's general assets, a practice that points to the Company's involvement—as opposed to the Plan Administrator—in the clerical task of administrating and paying such simple payments.[10] In Rosario-Cordero, the First Circuit intimated that such straightforward enterprise entailed no risk of fund mismanagement. Cf. id. The Company's argument that it suspended Gautier's severance benefits in order to "safeguard the financial

---

[9] Contrary to the employers in Rosario-Cordero, the Company, through Sanabria, is involved in "[t]he application for or the administration of the benefits." Id. at 124. And, whereas in Rosario-Cordero, where "[t]he payment of vacation benefits under the Plan rest[ed] on contingencies and processes entirely outside of the individual employers' and employees' control[,]" id., the severance payments here were triggered by the Company's decision to terminate an employee.

[10] See Docket # 32, ¶ 40 ([T]he severance payments received under the [Severance Agreement] were paid from the 'cost center # 2994997.'This is the *same 'cost center'* from where [Gautier's] regular salary was paid in the manicuring department prior to her discharge."). The Company does not rebut this contention.

integrity of employee's benefit fund" is unpersuasive in light of the above. Congress designed ERISA, among other things, to protect employees from losing their promised benefits because of employer mismanagement. E.g., Massachusetts v. Morash, 490 U.S. 107, 112-13, 109 S.Ct. 1668, 1671, 104 L.Ed.2d 98 (1989) (citations omitted).  By transferring to Gautier the blame for its fault in calculating her benefits, the Company seeks to turn such noble purpose on its head.  Even assuming, *arguendo*, that the Severance Plan mandated such "financial integrity" here, it would nevertheless be ephemeral: on November 10, 2010, at the latest, Bristol would have had made no further payments to Gautier. The same holds true for the other benefit contained in the Summary Plan Description ("SPD"), as fully discussed below. What is more, per the Severance Agreement as soon as Gautier obtained new employment—theoretically, the day after her termination date, on May 20, 2010—her severance payments would automatically end, and "[a]ny remaining severance [would be] payable to [her] as a *lump sum . . . .*" Docket # 6-1, p. 5 (emphasis added). Such undertaking does not strike the Court as sufficiently elaborate to fall under the purview of ERISA.  See Fort Halifax, 482 U.S. at 12, 107 S.Ct. 2211 ("To do little more than write a check hardly constitutes the operation of a benefit plan. Once this single event is over, the employer has no further responsibility.").

In the case at hand, as in Rodowicz, the purported ERISA plan "did not require that the Company make a long-term financial commitment to any employee who chose to participate." 192 F.3d at 171.  Further, the First Circuit has held, and this court so holds, that a series of severance incentives like the ones offered to Gautier, also based on years of service, do not constitute an ERISA plan because those payments "required no complicated administrative apparatus either to calculate or to distribute the promised benefit." Belanger, 71 F.3d at 455.

The Company argues that Gautier's "[s]everance benefits were not paid in a lump sum, but rather scheduled to be paid on a weekly basis through 25 weeks." Docket # 15, p. 9 (citation

omitted). As noted above, such contention is inaccurate, as the obtainment of new employment triggered a lump-sum payment. At any rate, just because Bristol opted to pay Gautier's severance benefits "[o]ver a period of time does not mean that the [Severance Plan] amounts to an administrative scheme." Tinoco v. Marine Chartering Co., Inc., 311 F.3d 617, 622 (5th Cir. 2002); see also Delaye v. Agripac, Inc., 39 F.3d 235, 237 (9th Cir. 1994) ("Sending [plaintiff] . . . a check every month plus continuing to pay [her] insurance premiums for the time specified in the employment contract does not rise to the level of an ongoing administrative scheme."). The underlying rationale behind such reasoning is the lack of a long term, real financial commitment by the employer for the benefit of an employee. Cf. Belanger, 71 F.3d at 454 ("Since a single-shot benefit requires no greater assurance than that the check will not bounce, ERISA's panoply of protections has virtually nothing to do with such a simple task.") (citation omitted). Like the severance at issue in O'Connor, Gautier's severance bonus was based on a rigid mathematical formula: Gautier's tenure, calculated at the rate of two-and-a-half week's pay for each of the first ten years of service plus two weeks. In short, "[s]imple arithmetic . . . dictated the amount of the bonus." 251 F.3d at 269.

Particularly, where as here, such mechanical calculation was completed *before* Gautier even signed the General Release and Severance Agreement, the Court finds that at its core, the Severance Plan is a "take-it-or-leave-it incentive" that did not create the *need* for an ongoing administrative burden. O'Connor, at 266-67; but cf. Ballesteros v. Bangor Hydro-Electric Co., 463 F.Supp.2d 97, 100 n. 2 (D.Me. 2006) (holding that a severance package that included *payment of retirement benefits*, triggered ERISA's "[c]oncerns about an ongoing administrative scheme that is subject to mismanagement as opposed to a 'one-shot, take-it-or-leave-it' incentive") (citation and internal quotation marks omitted).

Bristol next contends that it "was obligated over a prolonged time period, even after Gautier's termination, to provide her with severance benefits." Docket # 56-1, p. 7. But the unambiguous terms of the SPD, which oblige Bristol financially for a *maximum* of six months, bespeak otherwise. The case law, moreover, forecloses the Company's unavailing argument, recognizing that six months, by definition, is not a prolonged period of time capable of compromising the employer's financial integrity. See e.g., De Jesus, 2009 WL 3048415, at *6 (holding that a plan which provided payments to employees for over three months and up to one year required no continuous administration); Wells v. General Motors Corp., 881 F.2d 166, 176 (5th Cir.1989) (finding that an early-retirement incentive program where payment could be made in installments over a two-year period was not ongoing and there was no need for continuing administration).

*Whether the benefits come due upon the occurrence of a single, unique event*

As previously indicated, in deeming the Severance Plan a "plan" under ERISA, the Court over relied on the fact that there was not a single, unique event (such as a plant closure, see Fort Halifax, 482 U.S. at 1, 107 S.Ct. 2211) triggering payment of benefits to all participants. Rather, the Company contends that eligible participants would receive a severance package upon their individual involuntary termination. Not surprisingly, the Company stresses the fact that Severance Plan "[i]s not a temporary "one-time only" program, but an established Severance Program continuously in place, for several years, for all eligible employees." Docket 56-1, p. 7. This argument carries considerable weight as it militates in favor of finding an ERISA-covered plan. But again, such factor, without more, is inconclusive. See Belanger, 71 F.3d at 455 (holding that no "authoritative checklist" exists for courts to consult in order to determine whether an employer has established an ERISA program).

Be that as it may, common sense dictates the logic behind the "single event" factor; the lack of such triggering event, *usually* implies that a company's "plan" necessitates a complex, administrative scheme subject to management abuse. But here, regardless that other employees are also eligible and that the Severance Plan is triggered by successive terminations and not by a single event, nothing changes that Bristol's financial commitment with respect to such terminated employee is minuscule. See James v. Fleet/Norstar Fin. Grp., 992 F.2d 463, 467 (2d Cir.1993) (finding that payments made to employees with different termination dates and eligibility criteria required only "simple arithmetical calculations."). In the present case, there are no long term benefits or investments that would impose upon Bristol a burden substantial enough to reasonably mandate an ongoing administration scheme. See Belanger, 71 F.3d at 454 ("[O]ngoing investments . . . are uniquely vulnerable to employer abuse or employer carelessness, and thus require ERISA's special prophylaxis.").

As fully discussed above, the Company's commitment ends, at the longest, after a six-month period. In this sense, *none* of ERISA's regulatory safeguards exists here: (1) preventing "[a]buses of the special responsibilities borne by those dealing with plans[,]" Fort Halifax, 482 U.S. at 15, 107 S.Ct. 2211 (citation omitted); (2) safeguarding "[e]mployees from 'such abuses as self-dealing, *imprudent investing*, and *misappropriation of plan funds*[,]'" id. (quoting remarks of Representative Dent, 120 Cong. Rec. 29197 (1974) (emphasis added)); and (3) providing employees with information "'covering in detail the fiscal operations of their plan.'" Id. at 16 (citation omitted). Here, however, the Company's obligations simply "[d]id not involve promises that had to be kept over a *lengthy period*, nor did the company thereby make any *lasting* financial commitment of a type that might implicate ERISA's substantive protections." Belanger, 71 F.3d at 455. (emphasis added).

This court, moreover, is persuaded by its sister court's analysis in D'Oliviera.  Faced with a similar "ongoing" severance plan established for the benefit of terminated employees, the court held:

> [T]he . . . plan is not an ERISA plan, *notwithstanding that new obligations are made to employees as each is terminated.* In an earlier ruling the First Circuit stated, '[b]ut so long as <u>Fort Halifax</u> prescribes a definition based on the extent and complexity of administrative obligations, line drawing of this kind is necessary and close cases will approach the line from both sides.' Therefore, *although employees will become eligible over time for various reasons*, this Court concludes that *the administrative burden measured under this element is not significant enough in scope and degree* to bring the original plan over the <u>Fort Halifax</u> threshold.

150 F.Supp.2d at 352 (citing <u>Simas</u>, 6 F.3d at 854 (emphasis added)).  After careful consideration, the Court believes that such rationale controls the instant case.

*The Company's discretion in administering the "plan"*

The extent to which the employer must exercise discretion comprises a telling factor in determining a question of ERISA applicability, as it evinces the complexity (or lack thereof) of the program in question. <u>O'Connor</u>, 251 F.3d at 267 ("The determination of what constitutes an ERISA plan thus turns most often on the degree of an employer's discretion in administering the plan."). As aptly framed by Judge Coffin: "[w]here subjective judgments would call upon the integrity of an employer's administration, the fiduciary duty imposed by ERISA is vital. But where benefit obligations are administered by a mechanical formula that contemplates no exercise of discretion, the need for ERISA's protections is diminished." <u>Id.</u>

In the case at hand, Bristol concedes that it has no discretion in determining the employee's eligibility because all that is required is for the employee to be involuntarily terminated and that he or she signs the General Release. <u>See</u> Docket # 56-1, p. 6. ("[N]either Bristol nor the Plan Administrator have discretion to deny severance benefits to those terminated employees who are eligible to them under the terms of the plan."). While Bristol

does need to make an initial determination pursuant to certain boilerplate exclusions contained in the Severance Plan—e.g., "for cause" criteria, Docket #15-4, pp. 3-4— the First Circuit has deemed such "clerical" exercise insufficient to convert a plan into an ERISA-regulated plan. O'Connor, F.3d at 269 (finding that for-cause determination did not involve the type of discretionary determination subject to abuse that triggers an employer's fiduciary obligation to its beneficiaries). As Gautier correctly asserts, such objective, simple requirements were made *before* the employee signed the Severance Agreement. There is simply no administration *afterwards*. See D'Oliviera, 150 F.Supp.2d at 353 ("Once the guided 'for cause' determination was made, no administrative apparatus, either to calculate or to distribute the promised benefit, was involved. Only a simple, arithmetical application of the salary table was required.").

This is bolstered by the fact that such process was evidently self-executing: as soon as Gautier was terminated, an effortless check of her files would notify someone in the Human Resources Department (e.g., Sanabria) whether the termination was with cause. If the termination was unjustified, as was the case here, Sanabria simply tabulated the severance payments based on an effortless mathematical formula dictated by the Severance Pay Worksheet. Indeed, Sanabria signed both the Notice of Termination and the General Release. Docket # 6-1, pp. 4 & 10. Such small clerical tasks, even in the aggregate, are insufficient to impose upon Bristol a burden substantial enough to warrant ERISA's aegis. D'Oliviera, 150 F.Supp.2d at 353 (holding that a determination of whether employees were terminated for cause does not create an administrative burden substantial enough to invoke ERISA); Velarde v. Pace Membership Warehouse, Inc., 105 F.3d 1313, 1317 (9th Cir. 1997) (finding that merely determining whether an employee was terminated for cause is a "minimal quantum of discretion [in]sufficient to turn a severance agreement into an ERISA plan").

As in D'Oliviera, the administration of the "for cause" criteria here merely required a straightforward application of the listed "acts of willful misconduct or activity deemed detrimental to the interest of [the Company] . . . ." Docket # 15-4, p. 4. But, unlike the severance package in Simas, the Severance Plan created no burdensome scheme for individualized *discretionary* determinations of the eligibility of employees for retirement benefits. See 6 F.3d at 853-54 (finding that an ERISA plan existed because the determination of whether an employee was discharged for cause was "likely to provoke controversy and call for judgements based on information well beyond the employee's date of hiring and termination[,]" requiring the employer to maintain records, and make payments or otherwise actively dispute the obligation). Furthermore, the "eligibility" criteria outlined in the SPD, see Docket 15-4, pp. 3-4, is unlike those found in Emmenegger v. Bull Moose Tube Co., 197 F.3d 929, 935 (8th Cir.1999) (finding ERISA plan where eligibility for severance pay required employer to evaluate the quality of employee's service) or Schonholz v. Long Island Jewish Med. Ctr., 87 F.3d 72, 76 (2d Cir.1996) (deeming ERISA implicated where employer determines whether fired employee had made a "good faith effort" to secure employment elsewhere). In short, the mechanical, one-time, initial determination involved here does not carry the day. See Rodowicz, 192 F.3d at 171 (finding that plan that contained exclusions was "somewhat less mechanical and unthinking" but required no "individualized determinations"). Consequently, the level of subjective assessment of cause here—an initial clerical determination devoid of any discretion—falls short of the threshold required by the First Circuit in Simas.

The "appeal" mechanism the Company alleges Gautier failed to exhaust, also enlightens the Court as to the Company's evident lack of managerial discretion. According to the SPD, such process worked the following way:

> If upon the date of [Gautier's] termination of employment [she] is not
> advised that [she] will be eligible to receive severance payments from the

> Severance Plan, [Gautier's] claim for severance benefits under the Severance Plan is deemed denied." If a claim for severance benefits under the Severance Plan is denied in full or in part, [Gautier] may appeal the decision to the Plan Administrator. To appeal a decision, [she] must [mail] a written document . . . appealing the denial of the claim within 60 days after [Gautier's] termination of employment . . . .

Docket # 15-4, p. 13. How an aggrieved employee would find this out is a mystery, as the SPD is supposedly disseminated *after* an employee's "automatic" enrollment. Per the SPD, moreover, the Company does not communicate a "denial" of benefits; thus the initial communication an "eligible" employee received is the Notice of Termination Sanabria allegedly provided to Gautier. Such standard process is uncharacteristic of an ERISA plan. See Rosario-Cordero, 46 F.3d at 124 (finding an ERISA plan when "[e]mployees seeking their vacation benefits must apply directly to the Plan Administrator to obtain them").[11]

    To recapitulate, the Severance Plan lacks managerial discretion as to eligibility because (1) it was open to all of Bristols's involuntarily terminated employees with limited, straightforward exclusions; (2) the calculation of the benefits was mechanical; (3) Bristol lacked discretion to exclude eligible employees; and (4) the benefits were offered by the Company in take-it-or-leave it terms as opposed to the employee's application to the Plan Administrator.

    *The "reasonable employee" perspective*

    In Belanger the First Circuit made clear that ERISA's applicability must be analyzed from the employee's point of view: "[w]hether, in light of all the surrounding facts and circumstances, a reasonable employee would perceive an ongoing commitment by the employer

---

[11] Strangely, the "Administrator" deemed Gautier's initial letter rejecting the New Agreement as an "appeal," although Gautier was never officially "denied" a claim pursuant to the "process," and the sixty day deadline to "appeal" had already elapsed by then. At any rate, the installment of the referenced "appeal" process bears little weight when compared with the other non-ERISA qualities implicated here. See Rodowicz, 192 F.3d at 172.

to provide employee benefits. . . . Thus, evidence that an employer committed to provide

long-term . . . benefits to its employees will often be telling." 71 F.3d at 455 (citations omitted).

To that effect, in its show cause order, the Court cited Dakota, Minnesota & Eastern R.R.

Corp. v. Schieffer, 648 F.3d 935, 938 (8th Cir. 2011), a case of first impression, for the

proposition that a "one-person" contract providing severance benefits to a single employee was

not an ERISA employee welfare benefit plan. In its show cause response, Bristol clarifies that

it "[h]as never argued that each Severance Agreement entered into with each participant

constitutes an ERISA plan, but that the Severance Agreement is but one of the requirements set

forth in the Severance Plan in order to obtain benefits under it." Docket # 56-1, p. 6.  Hence,

it asserts that it enacted the Severance Plan, which is applicable to any eligible employee that

signs the General Release, to provide benefits to all terminated employees, not just Gautier. Id.

Nevertheless, "[B]ristol concedes that the Severance Agreement may be reasonably considered

as a one-person contract, since it has to be signed by each terminated employee individually in

order to be eligible to obtain the benefits under the Severance Plan." Docket # 67, p. 5.

For the reasons set forth below, the Court agrees with Gautier that a reasonable employee

would perceive that the Severance Agreement was a singular agreement between she and her

former employer, offered exclusively to comply with Puerto Rico's rather generous labor

legislation in exchange for a waiver and release. Several reasons lend credence to this

determination. First, according to the complaint, neither Sanabria nor Bristol provided Gautier

with any "[E]RISA Plan and/or summarizing any benefits under ERISA, or any retirement

plan." Docket # 59, ¶ 19.[12] Second, while the Notice of Termination referred to the Severance

_____

[12] While the Company alleges that it provided Gautier with the SPD along with the Notice of
Termination, such document is not part of the Notice of Termination's attachments. Moreover, the
record shows that the Company proved that it enclosed a copy of the SPD (Docket # 71-6, p. 20), for
the first time, on September 7, 2010. E.g., Phelan v. Wyoming Associated Builders, 574 F.3d 1250,

Plan multiple times, the term ERISA is nowhere to be found and no reference was made to any administrative process whatsoever. Thus, a reasonable employee could construe such "plan" as the collection of her severance benefits in a "package," in exchange for her right to sue the Company. Third, the General Release expressly provides that "[t]he parties agree that the [Severance Agreement] shall be governed by the laws of the Commonwealth of Puerto Rico. . . ." Docket #6-1, p. 9. And fourth, the acronym "ERISA" only appears once in the Notice of Termination and its attachments: ironically, in the section where Gautier "waived" such cause of action.

On this point Bristol incorrectly asserts that the severance benefits awarded to Gautier exist "[*e*]*xclusively*, by virtue of an ERISA-covered severance plan," Docket # 67, p. 5, because such contention is contradicted by the Severance Worksheet's plain language: "The severance payments set forth [here] are designed to comply with any and all statutory obligations that may arise out of an involuntary termination including, but not limited, to statutory payments under Puerto Rico Act 80 . . . ." Docket # 6-1, p. 6. It follows that Gautier, who was involuntarily terminated, waived her Law 80 claims in consideration for the severance payments Bristol now incorrectly seeks to condition on the existence of an ERISA plan. See In re Palmas del Mar Properties, Inc., 932 F.Supp. 36, 39 (D.P.R. 1996) (construing the purpose and history of Law 80 and describing the statute as "indemnity payment [that] is standard in all cases. . . . [and] is nothing else but a punishment, a fixed remedy due to any employee unfairly fired"); see also Orsini Garcia v. Srio. de Hacienda, 177 P.R. Dec. 596 (2009) (holding that the remedies conferred by Law 80 cannot be waived by employees).

---

1559 (10th Cir. 2009) (interpreting "received" to mean "postmarked"). In any event, this issue is far from determinative.

True, the severance payments are slightly more generous than the discharge indemnity prescribed by Law 80, although the parties dispute whether the amount of money Bristol paid Gautier (before freezing payments) satisfies what the state law mandates. The Court need not resolve such dispute, as there is a more fundamental reason why the severance benefits "awarded" to Gautier undoubtedly exist—independently of the Severance Plan: namely, a *quid pro quo*, whereby Gautier surrendered her right to file suit against the Company in connection with her involuntary termination. See Docket # 6-1, p. 8. ("In consideration of the benefits that you will receive in exchange for executing the [Severance] Agreement [and General Release] . . . ."); see also Orsini Garcia, 177 P.R. Dec. 596 & n. 58 (finding that a general release akin to the one present here is a settlement agreement (*contrato de transaccion*)).

The existence of Gautier's other benefits was thus predicated upon such contractual arrangement, not on the Severance Plan or the Company's altruism. The First Circuit has cautioned that, when faced with these type of waivers, courts "[s]hould scrutinize an ostensible waiver with care in order to ensure that it reflects the purposeful relinquishment of an employee's rights. Smart v. Gillette Co. Long-Term Disability Plan, 70 F.3d 173, 181 (1st Cir. 1995).

In light of the above, and seen from a reasonable employee's perspective, the Court finds that the Notice of Termination and the documents included therein, could plausibly be interpreted as a one-person contract between the Company and Gautier.

*Other Benefits*

The other elements of the Severance Plan— all temporary and limited in nature—are the following: Health Care Plan, Life Insurance, and the Employee Assistance Program ("EAP"). Docket # 15-4, pp. 8-9. As to the Health Care Plan and Life Insurance, these were identical: Gautier could remain in her Bristol-subsidized medical plan and a Bristol-provided limited life

insurance until earlier of (1) six months measured from her termination date, (2) the day her severance payments end, or (3) the date Gautier begins new employment. Docket # 15-4, p. 8. Alternatively, Gautier could opt to continue coverage as required by COBRA.[13] As was the case with the severance payments, theoretically speaking, if Gautier became employed on May 20, 2010, the day after her termination, such benefits would cease forthright.

In O'Connor, the First Circuit faced a similar situation, where a severance payments' mechanical and simple calculation outweighed non-severance benefits such as COBRA. 251 F.3d at 270. Concluding that these kind of "minor perks" fell short of establishing an ERISA plan, the court held that

> [t]he "Severance Plan" consists of a . . . lump-sum severance, the centerpiece of the incentive, plus a few enhanced benefits that otherwise would have been provided upon retirement under pre-existing ERISA plans, though without the added inducement . . . of COBRA premiums for a year. Although . . . these non-severance benefits might implicate ERISA to some extent, we are persuaded that they did not transform the [Severance Plan] as a whole into an ERISA-protected plan. These were minor perks attached to the severance. *Neither involved the kind of ongoing discretionary judgments that would sufficiently tax an employer's administrative integrity to warrant ERISA's prophylaxis*

Id. (emphasis added).[14] Confronted with "plans" that temporarily extend the continuation of healthcare benefits, other Circuits have reached identical results. See e.g., Angst v. Mack

---

[13] COBRA is an acronym for Consolidated Omnibus Budget Reconciliation Act of 1985, Pub.L.No. 99–272, 100 Stat. 82. The COBRA provisions of ERISA relate to continuing health care coverage after an employee's termination. According to the Notice of Termination, *the COBRA benefits, which were to be paid in full by Gautier (the Company made no contributions), were not contingent upon the execution of the General Release.* Docket # 6-1, p. 2.

[14] According to the SPD, a "Rule of 70" benefit may apply. See Docket # 15-4. But this benefit, whose calculation is also mechanical, is disbursed and administered pursuant to the Bristol-Myers Squibb Retirement Income Plan, which is neither at issue here nor applicable to Gautier. Id. Hence, the Court will refrain from discussing the effect, if any, of these "Rule of 70 pension payments" on ERISA's applicability.

Trucks, Inc., 969 F.2d 1530, 1539 (3d Cir.1992) (holding that a plan's "[p]rovision of a year of continued benefits . . . did not require the creation of a new administrative scheme, and did not materially alter an existing administrative scheme . . ."); Stokes v. Local 116 of Intern. Union of Electronic, Elec., Salaried, Mach. and Furniture Workers, Civ. A. No. 92–3131, 1993 WL 23895, at *8 (E.D. Pa. Feb. 2, 1993) (finding that six months of continued health benefit did not require the development of an administrative scheme).

As for the temporary (i.e., six months) continuation of Gautier's life insurance coverage as well as the EAP, the Court finds that these peripheral benefits imposed no burden upon the Company's administrative integrity. While the Company cites no case law on this front, the Court found precedents defeating its proffer. See e.g., Arivella v. Alcatel-Lucent, 755 F. Supp. 2d 353, 364 (D. Mass. 2010) ("Continuation of the certain insurance benefits for one year and the ability to roll the cash payments into an IRA do not strike the Court . . . as the sort of ongoing administrative programs that would shift the [plan] into the ambit of ERISA."); Kaelin v. Tenneco, Inc., 28 F.Supp.2d 489, 491 (N.D.Ill. 1998) (determining that an employee assistance program is not an ERISA plan); see also Taggart Corp. v. Life and Health Benefits Admin., Inc., 617 F.2d 1208, 1211 (5th Cir.), cert. denied, 450 U.S. 1030, 101 S.Ct. 1739, 68 L.Ed.2d 225 (1980) (holding that an employer's "bare purchase" of an insurance policy is insufficient to establish an ERISA plan). Accordingly, these superficial, short-term "fringe benefits," even in the aggregate, fall short of converting the Severance Plan into an ERISA-protected plan.

**Conclusion**

The collective effect of the temporary, minor benefits is insufficient to counteract the non-discretionary attribute of the severance payments, the cardinal aspect of the "plan." With the exception of the "single event" factor, the administration of the benefits delineated in

Gautier's Severance Agreement, falls short of *requiring* the establishment of a distinct, ongoing and complicated administrative scheme subject to employer abuse. By like token, it cannot be gainsaid that the calculation, processing and administration of such benefits "[r]equire[d] the exercise of discretion to the degree that would justify saddling an employer with fiduciary responsibility *and foreclosing an employee's state claims*." O'Connor, 251 F.3d at 271 (footnote omitted; emphasis added).[15]

In sum, the Severance Plan (at least as applied to Gautier) is not an employee benefit plan within the scope of ERISA because it neither requires a prolonged administrative and financial apparatus nor imposes upon the Company a substantial burden, nor long term financial obligations with respect to its employees; and the Company lacks management discretion as to the employees' eligibility, among the other reasons articulated above. Because the Severance Plan is not a "plan" governed by ERISA, her claim that the Severance Agreement was breached does not present a federal question; any obligations Bristol  may have with Gautier are contractual in nature, are governed by the terms of the Severance Agreement and do not implicate ERISA. Consequently, the Court lacks subject matter jurisdiction to entertain this action, and removal is, therefore, improper.

---

[15] While this court in no way discourages the formation of ERISA plans, it will not allow the Company to use ERISA as a pretext to foreclose Gautier's meritorious state law claims. Cf. Metropolitan Life Ins. Co. v. Glenn, 554 U.S. 105, 113-14,128 S.Ct. 2343,171 L.Ed.2d 299 (2008) (noting that Congress' efforts not to discourage employees from creating benefit plans is "[o]utweighed by '[its] desire to offer employees enhanced protection for their benefits.'") (quoting Varity Corp. v. Howe, 516 U.S. 489, 497, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996)). Ironically, although Congress specifically crafted the preemption provision to protect employees, see e.g., Helfman v. GE Group Life Assur. Co., 573 F. 3d 383, 391 (6th Cir. 2009), "[i]n practice [it] almost never comes up in a way that favors participants." Andrew Stumpff, Darkness at Noon: Judicial Interpretation May Have Made Things Worse for Benefit Plan Participants under Erisa than Had the Statute Never Been Enacted, 23 St. Thomas L.Rev. 221, 229 (2011).

There is one loose end: whether this court should entertain Gautier's state law claims notwithstanding the absence of federal jurisdiction. None of the parties has addressed this issue. Recently, in Redondo Const. Corp. v. Izquierdo, 662 F.3d 42, 49 (1st Cir. 2011), the First Circuit recapitulated the well settled rule that "[i]f the federal claims are dismissed before trial, . . . . the state claims should be dismissed as well." Id. (quoting United Mine Workers v. Gibbs, 383 U.S. 715, 726, 8s6 S.Ct. 1130, 16 L.Ed.2d 218 (1966)). It reminded, however, that such general principle is no "mandatory rule to be applied inflexibly in all cases[,]" id. (citation omitted), punctuating that "[d]istrict court[s] must exercise 'informed discretion' when deciding whether to exercise supplemental jurisdiction over state law claims." Id. (quoting Roche v. John Hancock Mut. Life Ins. Co., 81 F.3d 249, 256-57 (1st Cir. 1996)). Such determination implicates a weighing of several factors: to wit, comity, judicial economy, convenience, and fairness. Id. (citations omitted).

Having evaluated these elements, the Court declines to exercise supplemental jurisdiction in this case. The parties have concentrated their efforts here mostly on ERISA-related concerns; the Puerto Rico law issues, alas, have received no consideration. Further, discovery has not yet commenced. Comity, meanwhile, will be served by permitting the Commonwealth courts to resolve the important issues of contractual and employment state law that abound here. For the reasons stated, Gautier's motion is **GRANTED** and this case is hereby **REMANDED** to state court. Inasmuch as the Opinion and Order of June 20, 2011 contradicts the conclusions reached here, it is hereby **SET ASIDE**.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 29th day of February, 2012.

*S/ Salvador E. Casellas*
SALVADOR E. CASELLAS
U.S. Senior District Judge